IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PAUL ROBERTS**<br><br>　　　　　　**Plaintiff,**<br><br>　　　v.<br><br>**AMERICAN AIRLINES**<br>　　　　　　**Defendant.** | **CIVIL ACTION**<br><br>**No. 20-02202** |

**MCHUGH, J.**                                                                                                   **April 21, 2022**

### MEMORANDUM

Plaintiff Paul Roberts was a fleet service agent for American Airlines, Inc., terminated because the airline contended that he was away from his assigned position resulting in the delay of a flight. At the time, Mr. Roberts was working pursuant to a Last Chance Agreement negotiated after previous incidents. Plaintiff alleges that his discharge was in retaliation for the filing of a discrimination complaint some two years earlier, and that the airline breached its contract by terminating Plaintiff without presenting evidence of violations of his Agreement. Because Plaintiff fails to show evidence linking his termination to his earlier complaint alleging discrimination, and because Plaintiff's contract claim is preempted by the Railway Labor Act, I am obligated to grant summary judgment in Defendant's favor.

**I.      Factual Background**

Paul Roberts, a Jamaican American male, began his employment as a fleet service agent for American Airlines in June 2004. Paul Roberts Dep. at 24:2-14, ECF 32-2. Fleet service agents work in teams of three and are responsible for loading and unloading baggage between connecting flights and transferring bags from inbound flights to the airport baggage system. Roberts Dep. at

25:14-26:14; 34:9-14.  Fleet service agent teams are also responsible for pushing departing aircrafts back from the gate: one team member operates a tug vehicle connected to the nose of the aircraft and the other two members serve as "wing walkers," walking on each side of the aircraft to ensure sufficient clearance as it the plane is pushed back.  Roberts Dep. at 27:1-19.  A departing aircraft cannot push back from the gate without the full complement of three fleet service agents. Roberts Dep. at 27:20-28:3, 44:17-21.  Accordingly, American Airlines' policies require fleet service agents to "remain in their assigned work area as necessary for the efficient performance of their work." Attendance and Performance Program for Passenger Service and Fleet Service Employees Handbook, Ex. 1 to Lakshman Amaranayaka Decl. at 1. ECF 32-3.

The fleet service workgroup is unionized and is represented by the International Association of Machinists and Aerospace Workers ("IAM").  Roberts Dep. at 47:8-14, Amaranayaka Decl. at ¶ 4. ECF 32-3.  Depending on the length of a fleet service agent's scheduled shift, the governing collective bargaining agreement between the IAM and American Airlines ("IAM CBA") provides for one or two twelve-minute breaks during the shift.  IAM Fleet Service Collective Bargaining Agreement, Ex. 2 to Amaranayaka Decl. at Article 5(G), ECF 32-3. According to Laksham Amaranayka, American Airlines' Managing Director of Customer Operations, fleet service agents are not entitled to breaks at predetermined times because delayed flights and other operational irregularities common in the airline industry make it impossible to maintain a set schedule for breaks without disrupting the operation.  Amaranayaka Dep. at 11:19-1216, 13:6-9, 95:7-20, ECF 32-4. Thus, even though there can be downtime during shifts when fleet service agents have little to do, they may only take official breaks when someone in a supervisory capacity assigns them to a break. Amaranayaka Dep. at 63:6-17; 94:4-95:6.

### A. Plaintiff's 2014 Termination and Settlement Agreement

American Airlines first terminated Roberts' employment in July 2014. Roberts Dep. at 55:10-14; Amaranayaka Decl. at ¶ 6; Termination Letter (July 16, 2014), Ex 3 to Amaranayaka Decl. at 1, ECF 32-3. According to the termination letter, Mr. Roberts was fired because of two incidents. American Airlines alleged that on July 3, 2014, Mr. Roberts certified he had searched an aircraft's cargo compartments, but the aircraft departed with 22 bags that had not been unloaded from the night before and would have been discovered had Roberts searched the compartments, and second, that on July 7, 2014, he left his assigned work area without permission, only to return to the airport in time to clock out. *Id.* American Airlines certified that these incidents constituted failure to follow company policies and procedures, falsification of time records, and theft of time. *Id.* Accordingly, it terminated Roberts' employment on July 16, 2014. *Id.*

The International Association of Machinists and Aerospace Workers (IAM) then filed a grievance challenging Mr. Roberts' termination under the collective bargaining agreement. Roberts Dep. at 58:7-16; Grievance, Ex. 2 to Roberts Dep. at 1, ECF 32-2. In addition, Roberts filed a complaint of discrimination with the Pennsylvania Human Relations Commission ("PHRC") on December 1, 2014, asserting that his termination was the result of national origin, race and gender discrimination. Roberts Dep. at 65:3-11; PHRA Complaint of Discrimination, Ex. 3 to Roberts Dep, ECF 32-2.

On July 18, 2016, a settlement agreement was executed between American Airlines, IAM, and Plaintiff, which permitted Roberts to return to work on the condition that he agree to a one-year probationary period. Roberts Dep. at 69:2-16, LCA, Ex. 4 to Roberts Dep., ECF 32-2. The settlement, referred to as a "Last Chance Agreement," provided that, if American Airlines believes Plaintiff (the "Employee") violates the terms of the Agreement, "any violation of Company policy

3

or procedure ... will be just cause for [Roberts'] immediate termination." *Id.* at ¶ 3. Moreover, according to the Agreement, if American Airlines believes that the employee has failed to comply with any provision in the agreement, the company will conduct a meeting at which point it "will discuss with Employee the evidence in support of its belief that Employee has failed to comply with the terms and conditions of this Agreement." *Id.* at ¶ 7 § (b). Under the Agreement, the "Employee and/or Employee's Union representative will have the opportunity to present any evidence demonstrating their belief that Employee has not violated the terms of this Agreement." *Id.* at ¶ 7 § (c). The Agreement also contains a forum selection clause providing that any claim arising out of the Agreement "will be brought in the state or federal courts sitting in Tarrant County, Texas." *Id.* at ¶ 20. According to the agreement, Plaintiff's one-year probationary period was scheduled to end on July 12, 2017. Managing Director of Customer Operations for American Airlines Lakshman Amaranaya, who had not played any role in Mr. Roberts' original termination, was involved in approving the decision to enter into the Last Chance Agreement and reinstate Roberts. Amaranayaka Dep. at 13:22-14:5; 15:4-21; Amaranayaka Decl. at ¶ 8.

  B. **Plaintiff's Return to Work and Second Termination**

Pursuant to the LCA, Mr. Roberts returned to work in November 2016. Roberts Dep. at 77:22-24. Upon returning, he alleges that American Airlines retaliated against him for having filed the discrimination complaint in 2014. He cites the following instances as evidence of retaliation. On December 16, 2016, a manager named Matt purportedly told him to go outside during inclement weather in violation of company policy but did not require any other employee to do the same. Roberts Dep. at 176:14-18; Roberts Notes, Ex. 5 to Roberts Dep. at ¶ 14, ECF 32-2. The next day, the same manager accused Mr. Roberts of not chalking a belt loader but could not provide any details including the time or date that Mr. Roberts failed to do this. Roberts Dep. at 179:2-

4

180:14, Roberts Notes at ¶ 13.  Five months later, on May 17, 2017, Roberts was informed that a member of management was searching for him, but when he found management, he was informed that no member of management had been looking for him.  Roberts Dep. at 180:15-24; 185:1-185:23.  The final incident that Mr. Roberts points to occurred on June 6, 2017, when he was terminated for leaving his assigned post while awaiting a delayed plane's departure.  Pl.'s Mot. Opp'n to Def.'s Mot. Summ. J. at 6, ECF 35-1; Roberts Dep. at 93:18-24; 107:1-18.

Mr. Roberts and American Airlines have conflicting accounts regarding the events of June 6, 2017.  According to American Airlines Customer Service Manager Bruce Lancaster who reported to Manager on Duty Deschamps Etheart, Mr. Roberts "abandoned the gate" of a delayed flight for Boston without permission, which required Mr. Lancaster to "sen[d] an additional agent to the flight to get it off the gate."  Decl. Deschamps Etheart, Ex. D to Def's Mot. for Summ. J. at ¶ 2, ECF 32-5, Email from B. Lancaster to D. Etheart (June 6, 2017), Def's Ex. 1 to Etheart Decl at 1, ECF 32-5.  Lancaster reports that Roberts asked his co-worker from the gate to call him when the plane was ready to depart but failed to inform his gate lead that he was leaving the assigned work area.  *Id.*  Amaranayaka notes that the "concern was that Paul was not in his work area and we had a plane full of customers that were already delayed and were delayed further as the team was trying to locate Paul."  Amaranayaka Dep. at 21:13-18.

Mr. Roberts reports that he left the gate because he urgently needed to use the bathroom. In an investigation conducted by Mr. Lancaster with Mr. Roberts and his IAM union representative, Mr. Roberts reported that he notified his gate lead that he "had to use the rest room. [He] had been outside on the gate waiting as long as possible but eventually [he] could not hold it

any longer and had to go." Roberts' Incident Report, Ex. 6 to Roberts Dep. at 1-2, ECF 32-2.[1]  At his deposition testimony, Roberts testified to the same, stating that he "ha[d] to use the restroom because [he] was having the runners." Roberts' Dep. at 107:8-18. Mr. Roberts further testified that after using the bathroom, he stayed in the breakroom where the bathroom was located "because it was break time." Roberts Dep. at 110:16-21, 113:11-14.

Mr. Roberts' gate lead Vince Troil initially produced an employee statement which supported Mr. Roberts' version of events. Employee Statement, Ex. 7 to Roberts Dep at 1, ECF 32-2. In it, he noted that the plane to Boston had been delayed and was pushing back its departure, when "Paul Roberts advised [him] that he had to use the bathroom really bad" at which point he "told him to go." "[N]ot even a two minutes after [Mr. Roberts' had] left[,] that's when the pilot said he was ready to go...". *Id.* Because Mr. Roberts was not at the gate at the time that the plane was ready to depart, Mr. Troil requested another wing walker over the radio. *Id.;* Roberts Dep. at 131:11-24; 133:5-134:8.

## C. Meeting on June 8, 2017, and Termination

On June 7, 2017, Mr. Roberts received a written notice provided by Lakshman Amaranayaka regarding a meeting to be held on June 8, 2017, to determine whether Mr. Roberts had violated the Last Chance Agreement. Amaranayaka Letter, Ex. 8 to Roberts Dep. at 1, ECF 32-2. The letter stated that "in accordance with *paragraph* 7 of the LCA... [American Airlines] will consider the information provided by [him,] [his] Union representative, and the Company in this meeting."[2] *Id.* Mr. Roberts states that, when asked at the meeting why he left the gate, he

---

[1] According to this Incident Report, the incident in which Mr. Roberts left the gate of the delayed flight to Boston occurred on May 6, 2017, however, both parties seem to agree that the actual date that Mr. Roberts left the gate of the delayed flight to Boston occurred on June 6, 2017.

[2] In his memorandum in opposition to summary judgment, Roberts reports that the only information that American Airlines presented at the meeting was Roberts' incident report and the Troil's handwritten

informed meeting participants that he had left the gate to use the restroom and obtained Troil's permission before leaving his post. Roberts' Dep. at 138:8-16; 144:16-23; 147:13-148:8.

After this meeting, Etheart met with Troil. Troil then recanted his initial statement and signed a written memorialization that supported American Airlines' version of events. Etheart Decl. at ¶¶ 3-4; Troil Incident Report, Ex. 2 to Etheart Decl. at 1-2, ECF 35-5. In the later Incident Report, Troil states that Roberts went to a breakroom while the flight was delayed, but failed to return, such that Troil had to "g[e]t on the radio to a manager that [he] needed a wing walker." Troil Incident Report at 1. Troil reports that he submitted the initial statement supporting Mr. Roberts because he learned that he was on a Last Chance Agreement and wanted to help him. *Id.* at 2.

Amaranayaka terminated Mr. Roberts' employment on June 15, 2017.[3] Amaranayaka Termination Letter, Ex. 9 to Roberts Dep. at 1. He decided to terminate him both because he had not been present at his assigned gate and because Amaranayaka believed that he had lied during American Airlines' investigation by first "tell[ing] someone to call him when the airplane [wa]s ready to go...[a]nd then later on say[ing] that he [had left his post because he] had to use the restroom." Amaranayaka Dep. at 81:8-13.

---

Employee Statement." Pl.'s Mot. Opp'n to Def.'s Mot. Summ. J. at 11-12. However, upon reviewing the deposition testimony that Roberts cites at this portion of the memorandum, nowhere does Roberts state that this was the only evidence discussed at the meeting. In fact, in his deposition, Mr. Roberts reported that he could not remember many details from the meeting, including the statements made by managers, except an unnamed manager's comment about an upcoming vacation to Jamaica. Roberts Dep. at 138:17-139:7; 139:21-141:9; 145:5-7.

[3] Mr. Roberts suggests that American Airlines failed to follow appropriate procedures in terminating him. He points to the existence of a letter dated June 14, 2017 in which Amaranayka wrote that he had scheduled a meeting to be held on Friday June 16, 2017 to discuss the results of American Airlines' investigation into whether he had violated the Settlement Agreement, yet fired Mr. Roberts before that meeting could occur. Pl.'s Mot. Opp'n to Def.'s Mot. Summ. J. at 12; Ex. A to Pl.'s Resp., 36-1. But the Last Change Agreement does not require that two meetings occur before an employee is terminated.

After he was terminated, Mr. Roberts filed a complaint of discrimination with the PHRC and EEOC on August 4, 2017. Roberts Dep. 162:10-19; 8PHRC Complaint, Ex. 11 to Roberts Dep, ECF 32-2.

## II.     Legal Standard

This motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    Discussion

Because a reasonable juror could not find in Mr. Roberts' favor, Defendant's motion for summary judgment must be granted in full.

### A. Summary Judgment is Granted for American Airlines with Respect to Plaintiff's Retaliation Claim

#### 1. *Prima Facie Case*

Plaintiff asserts that he was retaliated against for filing a discrimination complaint with the Pennsylvania Human Relations Commission. Retaliation claims under the Pennsylvania Human Relations Act (PHRA), 43 P.S. §951, et seq. and the Philadelphia Fair Practices Ordinance (PFPO), Phila. Code, §9-1100, are governed by the *McDonnell-Douglas* burden-shifting framework. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (interpreting the requirements of plaintiff's PHRA claim the same as plaintiff's Title VII claim); *Hong v. Temple University*, No. 98–4899, 2000 WL 694764, at *9 (E.D. Pa. May 30, 2000) (PFPO claims are generally evaluated under the same legal framework as Title VII claims). Under the *McDonnell-Douglas* framework, a plaintiff first bears the burden of establishing a *prima facie* case of retaliation. *Moore v. City of Phila.*, 461 F.3d 331, 340 (3d Cir. 2006), as amended (Sept. 13, 2006). To state a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity; (2) his employer took adverse action against him and (3) there is a causal link between the protected activity and the

adverse action. *Id.* at 340-41. "If the employee establishes this prima facie case of retaliation, the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* at 342.

Here, Mr. Roberts unquestionably engaged in a protected activity by filing a discrimination complaint with the PHRC in 2014, alleging discrimination based on race, national origin, and sex. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 195 (3d Cir. 2015). His termination constitutes an adverse employment action, as American Airlines itself concedes. Def's Mot. for Summ. J. at 15. The question therefore is whether he was terminated *because* he engaged in protected activity.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 258, 267 (3d Cir. 2007) (citing *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503–04 (3d Cir.1997); *Woodson*, 109 F.3d at 920–21. The Third Circuit has noted, however, that a district court "is not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus [to be probative of a causal link]. Rather, [a court may also infer causation through] evidence gleaned from the record as a whole." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000). Such evidence may include "inconsistencies surrounding the adverse action itself, inconsistencies in the employer's reasons for taking the adverse action, the employer's conduct towards others, and whether the employer maintains an 'atmosphere of condoned harassment.'" *Webb v. Merck & Co. Inc.*, 450 F. Supp.2d 582, 601 (citing *Farrell,* 206 F.3d at 281).

9

A significant temporal gap between the protected activity and the adverse action does not rule out the possibility of proving retaliation, because "it is causation, not temporal proximity itself that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which to prove an element of causation." *Kachmar v. SunGaurd Data Systems Inc.*, 109 F.3d 173, 178 (3d Cir. 1997). That said, a gap of months between protected activity and the adverse action has been found to weigh against a finding of retaliation. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). And here, the lapse of time is substantial: more than two years passed between when Mr. Roberts filed his complaint with the PHRC and his termination, and more than six months passed between his return to work and his termination.

Critically, there is nothing else in the record from which a reasonable jury could find that Roberts was retaliated against for engaging in protected activity. According to Roberts, the concerted effort to retaliate against him included the following incidents: he was asked to go outside alone in inclement weather in violation of company policy; he was falsely accused of failing to chalk a belt loader; he was informed that management was searching for him when he was at his scheduled gate; and finally, he was terminated for leaving his post on June 6, 2017, when he alleges that he had permission to use the restroom.[4]  Although Roberts argues that these incidents "demonstrate a concerted effort by defendant to retaliate against plaintiff," Pl.'s Mot. Opp'n to Def.'s Mot. Summ. J. at 11, a series of minor incidents spread across months—which apparently did not even result in disciplinary action—does not constitute "a pattern of antagonism" or "an atmosphere of condoned harassment" sufficient to create an inference of retaliation.[5]  As courts in this Circuit have held, a

---

[4] Plaintiff also alleges that the gap between his union executing the LCA in August 2016 and his return to work in November 2016 is evidence of retaliation, but he offers no evidence to support this contention. Therefore, I need not consider this claim.

[5] The Plaintiff's attorney has failed to include accurate page numbers, and each page number is listed as "1." Therefore, the Court relies on the page numbers generated on ECF.

"pattern[] of antagonism [occurs] where an employee is subject to a 'constant barrage of written and verbal warnings' and 'disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until...discharge." *Kissinger v. Mennonite Home*, No. CV 20-3000, 2021 WL 5356801, at *14 (E.D. Pa. Nov. 17, 2021) (citing *Wells v. Retinovitreous Assocs.*, Civ. A. No. 15-5675, 2016 WL 3405457, at *3 (E.D. Pa. June 21, 2016), *aff'd*, 702 F. App'x 33 (3d Cir. 2017) (non-precedential) (internal citations omitted). These isolated incidents at the hands of different managers are far from a pattern of antagonism, especially because Roberts has failed to point to any evidence demonstrating that most of the managers even knew that he had filed a discrimination complaint or that he was on a Last Chance Agreement.

With respect to the June 6, 2017, incident which resulted in his termination, Roberts has provided no evidence to indicate that American Airlines considered his discrimination claim he had filed years before. And speculation alone is insufficient to sustain a retaliation claim because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)).

As I recently observed in an analogous case, *Claiborne v. SEPTA*, No. 2:19-CV-03011, 2021 WL 5298981, at *11 (E.D. Pa. Nov. 15, 2021) any causal link between Roberts' protected activity and his termination is unlikely given that the defendant employer reinstated Mr. Roberts *after* he filed a discrimination claim, which begs the question, why would American Airlines reinstate him if it was motivated to retaliate?

For these reasons, Plaintiff has failed to demonstrate a prima facie case of retaliation.

### 2. *Legitimate Non-Discriminatory Reason and Pretext*

Roberts has not demonstrated a prima facie case of retaliation, but even if he had, he cannot show that his termination was a pretext for retaliation.

American has satisfied its burden of coming forth with a legitimate nondiscriminatory reason for Plaintiff's termination. It plausibly contends that it terminated Mr. Roberts' employment because he violated his Last Chance Agreement when he left his assigned work area and thereby delayed the plane's departure. Having articulated a legitimate, non-retaliatory reason for Roberts' dismissal, the burden shifts back to him to demonstrate "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' from which a reasonable juror could conclude that the Defendants' explanation is 'unworthy of credence, and hence infer that the employer did not act for the asserted [non-retaliatory] reasons.'" *Carvalho-Grevious v. Delaware State Univ.,* 851 F.3d 249, 262 (3d Cir. 2017) (cleaned up).

Mr. Roberts asserts that with respect to the June 6, 2017 incident, Defendant "fabricated accusations against [him], wrongfully accusing him of breaching the terms of the Agreement when he left his post with permission to use the restroom; conducted an unfair hearing regarding the accusations by providing no evidence of Roberts['] alleged wrongdoing for him to rebut; ignored Robert[s'] evidence in his defense..." Pl.'s Mot. Opp'n to Def.'s Mot. Summ. J. at 10. But this argument is lacking. The record reflects that Mr. Roberts left his assigned gate during his shift, thereby delaying the departure of a plane full of customers. And although Mr. Roberts and American Airlines disagree as to whether Mr. Roberts left with or without permission to use the restroom, this is not material as "'[t]he question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [retaliatory].'" *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (quoting *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996)) (alteration in original). Here, nothing indicates a retaliatory motive.

Roberts attempts to prove pretext by pointing to certain inconsistencies in the record. First, he noted that Amaranayaka stated in the Termination Letter that American Airlines decided to terminate Roberts "after careful consideration of all the information provided *during* the settlement hearing, which was held on Thursday June 8, 2017," Termination Letter (July 16, 2014), yet Amaranayaka admits that in deciding to terminate Roberts, he relied on the statements from American Airlines' management and staff, including Lancaster and Etheart, which were not discussed at the meeting. Def's Mot. Summ. J. at 13-14. But this is hardly a material inconsistency as Amaranayaka could have both relied on information provided during the hearing *and* other information that he reviewed. And although Roberts argues that American Airlines should have presented the statements of management at the hearing, Roberts nonetheless had an opportunity during the hearing to present his side of the story. Second, Mr. Roberts points to the inconsistency between Troil's initial statement in which he reported giving Mr. Roberts permission to leave the gate, and his second statement in which he reported that Mr. Roberts went to the breakroom during a delayed flight and failed to return in time for the plane's departure. These statements certainly seem inconsistent, but there is no evidence in the record that Troil changed his statement because of a retaliatory motive.[6]

Plaintiff's attempt to cast doubt on American Airlines' proffered reasons for his termination fails, and taking the record as a whole, a jury could not reasonably find that Mr. Roberts was retaliated against for raising a discrimination claim years earlier.

---

[6] The record here falls far short of *Webb v. Merck & Co., Inc.*, 450 F. Supp. 2d 582, 601 (E.D. Pa. 2006), the case on which Plaintiff relies. In *Webb*, the Court found enough circumstantial evidence to support plaintiff's claim that the motive behind the suspension was retaliatory, where there was evidence that defendant "fabricated the incident," "disregard[ed] all of the witness statements," conducted an unfair investigation into the accusations, ignored plaintiff's evidence in his defense, and repeatedly attempted to catch plaintiff "making a reprimandable error," which was buttressed by email evidence that plaintiff was subjected to scrutiny over a five-month period. *Id.* Here, on the other hand, Roberts admits that he left his assigned gate during his shift, Roberts had an opportunity to present evidence in his defense, and American Airlines relied on the statements of various staff members as to Mr. Roberts behavior on the day in question.

### B. Summary Judgment Is Granted for American Airlines with Respect to Plaintiff's Breach of Contract Claim

Mr. Roberts argues that American Airlines violated the terms of the Last Chance Agreement by terminating him without presenting evidence as to what terms of the Last Chance Agreement (LCA) had been violated. Specifically, he asserts that American Airlines failed to "discuss...the evidence in support of its belief that Employee has failed to comply with the terms and conditions of this Agreement," LCA ¶7 § (b).

American Airlines argues that the Railway Labor Act (RLA) preempts Plaintiff's breach of contract claim. Plaintiff counters that his claim is not preempted because it "is simply based upon Defendant's failure to follow the terms of the LCA and grant Roberts due process" and "is not inextricably intertwined or substantially dependent upon analysis of the CBA." Pl.'s Mot. Opp'n to Def.'s Mot. Summ. J. at 15.

The Railway Labor Act (RLA) governs American Airlines' labor practices as a passenger air carrier. *See* 45 U.S.C. § 181. Congress passed the RLA "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) (citing *Atchison, T. & S.F.R. Co. v. Buell,* 480 U.S. 557, 562; 45 U.S.C. § 151a.). "To realize this goal, the RLA establishes a mandatory arbitral mechanism for…[the] settlement" of major disputes and minor disputes. *Norris*, 512 U.S. at 252.

"Major disputes concern the making and modification of the collective bargaining agreement itself and relate 'to disputes over the formation of collective agreements or efforts to secure them.'" *Miklavic v. USAir Inc*., 21 F.3d 551, 553-54 (3d Cir.1994) (citing *Flight Attendants, AFL–CIO v. USAir, Inc.,* 960 F.2d 345, 348 (3d Cir.1992) (internal citations omitted). "On the other hand, a minor dispute is 'a dispute arising or growing out of grievances or out of the

14

interpretation or application of agreements concerning rates of pay, rules, or working conditions' and contemplates an existing agreement." *Miklavic*, 212 F.3d at 554 (quoting *Consolidated Rail Corp. v. Railway Labor Exec. Ass'n*, 491 U.S. 299, 303 (1994). In short, "[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Conrail*., 491 U.S. at 307. The determination as to whether a dispute is major or minor implicates whether this Court has jurisdiction as "[f]ederal courts have broad powers to intervene in some major disputes, but the Act prohibits federal courts from being involved in minor disputes." *Association of Flight Attendants, AFL-CIO* at 348.

I conclude that this dispute must be categorized as "minor," depriving this Court of jurisdiction. The Last Chance Agreement here stems from a grievance regarding Mr. Roberts' earlier termination and was entered into under the terms of the Collective Bargaining Agreement in effect at the time. Courts have consistently found that Last Chance Agreements draw upon existing Collective Bargaining Agreements, therefore preempting federal court review. *Miklavic*, 212 F.3d at 554.[7] When faced with the issue of whether a settlement agreement was preempted by the Labor Management Relations Act, a virtually identical preemption standard to the RLA, [8]

---

[7] *See, e.g., Jensen v. Delta Air Lines, Inc*., No. 17-CV-13487, 2018 WL 2159789, at *2 (E.D. Mich. May 10, 2018), aff'd sub nom. *Jensen v. Delta Airlines, Inc*., No. 18-1582, 2019 WL 922509 (6th Cir. Feb. 12, 2019); *Moogalian v. Honeywell Int'l, Inc*., No. 3:13CV706, 2014 WL 1404564, at *2 (E.D. Va. Apr. 10, 2014) aff'd 580 F. App'x 200 (4th Cir. 2014); *Hart v. ArcelorMittal Steel*, No. 2:09-CV-065, 2011 WL 1296609, at *6 (N.D. Ind. Mar. 31, 2011); *Winters v. Ford Motor Co*., No. 06-CV-10263-DT, 2006 WL 3694611, at *5 (E.D. Mich. Dec. 12, 2006); *Connolly v. Bos. Edison Co*., No. CIV.A.00-11849-PBS, 2001 WL 575868, at *4-5 (D. Mass. May 15, 2001).

[8] *See Norris,* 512 U.S. at 260. Accordingly, courts assessing RLA preemption may properly rely on LMRA preemption cases. *See Int'l Ass'n of Machinists & Aerospace Workers Dist. Loc. Lodge 1776 v. Jackson*, No. CIV.A. 09-150, 2010 WL 597247, at *3 n.5 (E.D. Pa. Feb. 19, 2010).

the Fourth Circuit held that claims for breach of a settlement agreement that was entered into pursuant to the grievance procedure of a collective-bargaining agreement were preempted by § 301 of the LMRA. *David v. Bell Atlantic-West Virginia, Inc.*, 110 F.3d 245, 248 (4th Cir. 1997). In *David*, the Court relied on the following: a collective bargaining agreement established the conditions of an employee's employment; the employee was terminated and then filed a grievance under the applicable collective bargaining agreement; and the employee through the union entered into a settlement agreement allowing a return to work subject to dismissal for further infractions. Because the settlement "agreement's entire vitality and legitimacy thus dr[ew] on the underlying collective-bargaining agreement[,]" the Court reasoned that the claim for breach of the settlement was preempted. *Id.*

The situation here is nearly identical. Mr. Roberts' employment was governed by the CBA between the International Association of Machinists and Aerospace Workers (IAM) and American Airlines. Roberts filed a grievance pursuant to the Collective Bargaining Agreement to challenge his termination. Following this, Roberts, IAM, and American Airlines entered into a Last Chance Agreement. And as in *Davis*, the IAM Collective Bargaining Agreement continued to govern Roberts' employment with American Airlines upon his reinstatement except to the extent the LCA modified the definition of "just cause" for termination to mean "any violation of Company policy or procedure, including but not limited to, any violation of the Employee Handbook or the Attendance and Performance Program." LCA ¶3. The language of the LCA makes clear that the Settlement arose from the CBA.[9] Because the LCA arose out of the CBA and supplements the

---

[9] For instance, language in the LCA includes "Employee and the Union agree to keep the terms of this Agreement and the negotiation leading up to this Agreement confidential." LCA ¶16. Language referencing negotiations leading up to the LCA reflects a clear understanding that the agreement is not independent of prior negotiations between the Union and American Airlines.

CBA, the RLA preempts the federal court from determining whether American Airlines violated the Last Chance Agreement. As a result, this Court lacks jurisdiction over the claim arising out of the Agreement, entitling American to summary judgment on the contract claim.

## VI. Conclusion

American Airlines' Motion for Summary Judgment will be granted in full. An appropriate order follows.

/s/ Gerald Austin McHugh<br>
United States District Judge